# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**PANAGIOTA HEATH**                                          **CIVIL ACTION**

**VERSUS**                                                         **NO. 13-4978-SS**

**SOUTHERN UNIVERSITY SYSTEM**
**FOUNDATION, et al**
                                   **ORDER AND REASONS**

 Before the undersigned is the motion for summary judgment of the defendants named in the second amended complaint, the Board of Supervisors for the Southern University and Agricultural and Mechanical College ("Southern") and Mostafa Elaasar ("Elaasar"). The parties consented to proceed before the assigned Magistrate Judge. Rec. doc. 35. For the reasons described below, the motion is granted.

 The plaintiff, Panagiota Heath ("Heath") alleges that: (1) the action is brought pursuant to Title VII, 42 U.S.C. § 2000e; (2) 42 U.S.C. § 1983; and (3) provisions of state law forbidding discrimination based on ethnicity and gender and all retaliation provisions of state law.

 She alleges that: (1) she is a Caucasian female of Greek ethnicity, who speaks with a Greek accent and is a Greek Orthodox; (2) she began working at Southern in 1996 as an associate professor of mathematics; (3) in 2003 Elaasar became her direct supervisor as chairman of the College of Natural Sciences; (4) Elaasar is a native of Egypt and a Muslim; (5) he consistently appointed Muslim males to vacancies; (6) he made sexist remarks to Heath; (7) when she complained to him, he retaliated by attempting to isolate her professionally; (8) in June 2009, Heath filed suit in state court against Southern and Elaasar; (9) Elaasar committed further retaliatory acts; (10) Heath complained to higher ranking officials at Southern who failed to respond; and (11) because of the repeated humiliation, she suffered a nervous collapse and sought medical treatment. Rec. doc. 50. On April 8, 2013, Heath filed a charge of discrimination with

the EEOC based on sex discrimination and retaliation.  Defendants' Exhibit 4.  This suit was filed on July 3, 2013.  Rec. doc. 1.

Summary of the Parties' Arguments

As to the Title VII claims against Southern, defendants contend that Heath failed to exhaust her administrative remedies for either discrimination or retaliation based on her race, religion or national origin.  Defendants argue that most of the remaining allegations for the Title VII claims are time-barred.  Defendants urge that the timely allegations for the Title VII claims do not support either a retaliation claim or a claim that Heath was subjected to a hostile environment.

As to the Section 1983 claims against Elaasar in his individual capacity, he asserts qualified immunity.  Defendants argue that most of the allegations supporting the Section 1983 claims are time-barred.  They urge that the remaining allegations are not actionable.

Heath contends that the Title VII and Section 1983 claims present continuous violations. She argues that all allegations after the summer of 2011 are available to support her claims and they are sufficient for Title VII and Section 1983.

Defendants contend that the state law claims against them must be dismissed because: (1) Southern is an arm of the State of Louisiana for the purposes of Eleventh Amendment Immunity and it did not waive its immunity; and (2) Louisiana's law prohibiting employment discrimination does not provide a cause of action against an individual employee.  Rec. doc. 67 (Memorandum at 22-23).  Heath concedes that her state law claims must be dismissed.  Rec. doc. 70 (Memorandum at 26).  Defendants' motion for summary judgment is granted as to the state law claims.

Summary Judgment Standard

Fed. R. Civ. P. 56 provides in pertinent part that summary judgment will be granted when "... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

2

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).  Lujan v. National Wildlife Federation, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189 (1990). To that end, the court must "view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.  Wyatt v. Hunt Plywood, 297 F.3d 405, 409 (5th Cir. 2002).  Where the record taken as whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986); Washington v. Allstate Ins. Co., 901 F.2d 1281 (5th Cir. 1990).

Furthermore, the party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," but need not negate the elements of the nonmovant's case.  Celotex, 106 S.Ct. at 2553; see Lujan, 110 S. Ct. at 3187.  If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response.  If the movant does, however, meet this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.  Celotex, 106 S.Ct. at 2553-54.  A dispute over a material fact is genuine, if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Kee v. City of Rowlett Texas, 247 F.3d 206, 210 (5th Cir. 2001).

This burden is not satisfied with "some metaphysical doubt as to the material facts," Matsushita, 106 S.Ct. at 1356, by "conclusory allegations,"  Lujan, 110 S. Ct. at 3180, by "unsubstantiated assertions,"  Hopper v. Frank, 16 F.3d 92 (5th Cir.1994), or by only a "scintilla" of evidence,  Davis v. Chevron U.S.A., Inc., 14 F.3d 1082 (5th Cir.1994).  The court resolves factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.  The court does not,

however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.  See Lujan, 110 S. Ct. at 3188.   Summary judgment is appropriate in any case "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."  Armstrong v. City of Dallas, 997 F.2d 62 (5th Cir.1993).  If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted.  See Evans v. City of Bishop, 238 F.3d 586, 588-89 (5th Cir. 2000).  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

In Fierros v. Texas Dept. of Health, 274 F.3d 187 (5th Cir. 2001), the Fifth Circuit cautioned that summary judgment is not favored in claims of employment discrimination and that the Supreme Court in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 2110 (2000), emphasized the paramount role that juries play in Title VII cases, stressing that in evaluating summary judgment evidence, courts must refrain from the making of credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, which are jury functions, not those of a judge.  Fierros, 274 F.3d at 190-91.

## Background

Heath was born in July, 1948 in Khalkis, Greece.  She was raised in Athens and finished high school in Athens.  She came to the United States with her husband, a U.S. citizen.  She earned a bachelor's degree in math at Holy Cross College in New Orleans.  She obtained a master's degree in math and Ph.D. in mathematics education from UNO.[1]  Heath Dep. 7-8.

---

[1] Defendants submitted seven exhibits with their motion for summary judgment.  Rec. doc. 67.  They are referred to as Defendants' Exhibit __.  Heath submitted eighteen exhibits with her opposition.  Rec. doc. 70.  They are referred to as Heath's Exhibit __.  Some of Heath's exhibits contain more than one document. The citations to these exhibits also includes Bates numbers.  The defendants and Heath submitted the transcript of Heath's deposition on March 18, 2016.  See Defendants' Exhibit 3 and Heath's Exhibit 17.

In 1996, Heath began teaching math at Southern.

In May 1998, she was peer evaluated by Elaasar for the period August 1997 to May 1998. He assigned the highest possible score for each of the 20 categories; for example a three was assigned to "acquires increased expertise by reading, attending workshops and enrolling in courses related to the profession." Heath's Exhibit 2 (PL 00429-30).

In 1999, 2000 and 2001, Heath served on committees at Southern. Heath's Exhibit 3. In 2000, she received positive evaluations from students. Heath's Exhibit 4.

In the fall of 2001, Heath sought tenure and promotion to associate professor. There were at least eight letters of recommendation from other faculty, including letters from Elaasar, Joe Omojola, Cynthia Singleton, and Louise Kaltenbaugh. Heath's Exhibit 2 (PL 00421-28). Elaasar stated:

> Dr. Heath is a very considerate person with an appealing personality and her commitments to education are a great encouragement to her students. Students find her very approachable and knowledgeable of her subject.

Id. (PL 00427). Heath was promoted to associate professor of mathematics with tenure. Heath Dep. 10.

In 2003, Elaasar became chairman of the department of mathematics and physics. Heath's Exhibit 1 at para. 1.[2]

In 2003, Heath left New Orleans at Thanksgiving to see her sister in Virginia, who had been diagnosed with cancer. When she returned, she found that her final exam had been rewritten. Her students were being tested on material that she had not covered. Heath's Exhibit 1 at para. 8 and Heath Dep. 122-24.

---

Heath's Deposition is cited as Heath Dep. ___. No other transcripts of depositions were submitted by the parties.

[2] Elaasar ceased to be the chairman of the department in September 2013. Heath Dep. 85.

In 2005, Heath alleges that Elaasar denied her permission to go to Athens to see her dying mother.  Heath's Exhibit 1 at para. 7.

On June 20, 2005, Heath wrote a ten page "to whom it may concern" letter with complaints of harassment by Dr. Omojola, dean of science, and Elaasar.  The letter refers to:  (1) Elaasar's refusal to let her go to Athens to be with her mother; (2) the Thanksgiving 2003 visit to her sister; (3) a spring 2005 incident where a student allegedly was coerced into making a written complaint against her; (4) disparities in her compensation compared to other faculty; and (5) other issues. Heath's Exhibit 10 (PL 00462-71).

In 2005 after Hurricane Katrina, Elaasar and Heath were driving together to Southern University in Baton Rouge.  She reports that he related that he was a radical Muslim and the time would come when the Muslims will rise up and kill all the Christians.  Heath's Exhibit 1 at para. 14.

Right after Katrina, Heath applied for the position of full professor.  Her application was denied.  Heath's Dep. 10-12.  She has not submitted any further applications for the position of full professor.  Id. at 14.

On April 9, 2008, Heath wrote a memo to Elaasar concerning her request for a sabbatical to write a book.  Heath's Exhibit 10 (PL 00487-89).  Elaasar refused the request.  She believes that he did not refuse similar requests from male colleagues.  Heath's Exhibit 1 at para. 10.

Undated Letter.  Heath's Exhibits 10 and 16 (PL 00460-61).  The context of the letter demonstrates that it was written after the June 20, 2005 letter "to whom it may concern."  It is not clear, however, how long after 2005 it was written.  Considering the complaints about the math tutoring lab, her health and merit pay, the estimated date for the letter is the spring of 2009.

On June 2, 2009, Heath wrote a two page memo to Elaasar concerning his failure to involve her in the department throughout the spring semester of 2009.  Heath's Exhibit 10 (PL 00485-86).

On August 26, 2009, Heath filed a petition in state court against Southern, Elaasar and Victor Ukpolo.  She was represented by Willie Zanders.  Rec. doc. 67 (Exhibit 1).  The defendants' alleged wrongful actions included:  (1) denial of promotion to rank of full professor; (2) denial of the opportunity to teach night classes; (3) denial of the opportunity to participate in "Second Life Program;"[3] (4) denial of the opportunity to teach independent study courses; (5) denial of the opportunity to teach online courses; (6) denial of the opportunity to participate in a colleague's power-point presentation; and (7) denial of a fair annual faculty evaluation.  Defendants' Exhibit 1.[4]

On November 18, 2009, Heath wrote a three page letter to Elaasar regarding math tests for the Southern Association of Colleges and Schools ("SACS") assessment and Math 118, 151 and 161.  Heath's Exhibit 11 (PL 00508-10).

On February 3, 2010, Heath wrote a two page memo to Dr. Ukpolo, the chancellor, concerning the failure to promote her to professor in 2006/2007, Elaasar's refusal to let her attend a conference and his refusal to let her have a sabbatical to write a book.  Heath's Exhibit 11 (PL 00511-12).

On February 4-11, 2010, there were email exchanges between Heath and Singleton.[5]  It began with an issue concerning a meeting.  Someone made a comment that Heath was excluded

---

[3] Second Life Program refers to a teaching partnership with a professor or professors at UNO.  Defendants' Exhibit 1 at 3-4.

[4] Heath testified in her deposition that Zanders "didn't do anything.  He killed it [the lawsuit].  I called him and I called him.  He did not respond."  Heath Dep. 67.

[5] Cynthia Singleton is an African-American woman.  She is not a Muslim.  Heath Dep. 34.

from a meeting because she talked too much.  In later emails in the exchange Heath described gender issues.  Heath's Exhibit 13 (PL 00379-82).

On February 25, 2010, Heath wrote a three page memo to Dr. Sims, associate dean of students, concerning Math 151 and Math 161, Elaasar and Singleton.  Heath's Exhibit 11 (PL 00490-92).

On March 24, 2010, Dr. Omojola wrote to Heath concerning her statement in a March 22, 2010 meeting concerning the content of a math class taught by him.  Heath's Exhibit 11 (PL 00397).

On April 4, 2010, Heath wrote a three page response to Dr. Omojola.  Heath's Exhibit 11 PL 00398-400).

On April 14, 2010, Heath wrote a two page letter to Dr. Bishop, assistant vice chancellor, and Dr. Mims, assistant dean, concerning Elaasar and the final exams.  Heath's Exhibit 11 (PL 00506-07).

On April 19, 2010, Heath wrote a four page letter to Dr. Bishop and Dr. Mims concerning problems with Elaasar.  Heath's Exhibit 11 (PL 00401-04).

On April 27, 2010, about 15 students signed a note to Heath reporting that on April 22, 2010, Elaasar came to her classroom and asked questions concerning her work.  He reported that she did not teach all of the material the students needed and they could not keep up in other classes. Heath's Exhibit 14 (PL 00296-97).

On April 29, 2010, Louise Kaltenbaugh, director of alternative certification, wrote to Dr. David Adegboye, vice-chancellor for academic affairs, concerning Elaasar's decision to implement a common final exam for spring 2010.  In the letter Kaltenbaugh complimented Heath on her service to the college of education and her help with accreditation.  She was critical of the

8

decision to deny Heath input into the final exam for her course.  She was concerned that Heath was being "railroaded" due to cultural and gender biases.  Heath's Exhibit 15 (PL 00298).

April – May 2010.  There are nineteen letters, memos or emails from students describing Heath as a teacher in very positive terms.  Heath's Exhibit 8 (PL 00437-58).

On May 4, 2010, Heath submitted a ten page response to David Adegboye, vice chancellor for academic affairs at Southern, with attachments.  Heath's Exhibit 11 (PL 00299-08).[6]  The letter was written in response to an April 21, 2010 letter from the mathematics faculty to Adegboye concerning Heath.[7]  Heath's response addressed six "allegations" in the April 21, 2010 letter concerning her conduct:  (1) she consistently disrupts faculty unit and department meetings through unnecessary outbursts, answering her cell phone, shouting, and storming out of meetings; (2) she is uncooperative; (3) she is unavailable for student advising; (4) she does not follow protocols; (5) she is disrespectful of authority; and (6) she is not teaching according to the approved curriculum.  Id.

On July 1, 2010, Samuel S. Andrews, M.D., an endocrinologist at Ochsner, reported that Heath was his patient.  She had significant job-related stress.  Her diabetes and hypertension were uncontrolled.  She would benefit from a sabbatical leave.  Heath's Exhibit 12 (DEF 00007).

Heath was on sabbatical leave for the 2010/2011 academic year.  Heath's Exhibit 1 at para. 20.  She returned to Southern for the beginning of the 2011/2012 academic year.  Id. at para. 21.[8]

---

[6]  The letter without attachments is Defendants' Exhibit 7.

[7]  The April 21, 2010 letter from the mathematics faculty to Adegboye is not part of the record on the motion for summary judgment.

[8]  Heath contends that the temporal scope of her Title VII action begins with her return to teaching for the 2011/2012 academic year; approximately July 1, 2011.  There is no evidence that she taught during the summer of 2011.

In 2011, Derrlyn Mosby was in Heath's statistics class.  Heath was out ill.  Elaasar came into the classroom.  "It quickly became apparent that Dr. Elaasar was attempting to use Dr. Heath's absence to turn her students against her."  Heath's Exhibit 7.[9]

The parties agree that 300 days prior to the filing of the EEOC charge is June 5, 2012.[10] Rec. doc. 67 (Memorandum at 15) and Rec. doc. 70 at 13.

On September 19, 2012, Heath wrote to Dr. David Adegboye, vice chancellor of academic affairs.  She itemized 15 matters that she considered to be harassing and discriminatory behavior. Heath's Exhibit 16 (PL 00316-18).  The list is nearly identical to the list of 15 matters that appear in her May 2, 2016 declaration.  Heath's Exhibit 1 at 7-8.

In the fall semester of 2012, Donald Anderson, a student, met Elaasar in his office without the knowledge of Heath and asked Elaasar why he did not respect Heath and why he gave her a hard time.  Anderson concluded from Elaasar's response that he was looking for a submissive attitude from Heath.  After the meeting, Anderson and another student circulated a petition of support for Heath.  500 signatures were gathered before Heath asked them to stop.  Heath's Exhibits 5 (Anderson's declaration) and 9 (Petition).

Phillis Morris was at Southern during 2012-2014.  She describes Elaasar as belittling Heath in front of students.  There were several times when Elaasar attempted to substitute a test that he had prepared for the one which Heath prepared.  She describes Heath as an exceptional teacher.

---

[9]  Mosby's Declaration describes this incident as occurring "[o]n or about 2011. . . ."  There are no other dates in the Mosby Declaration.  With Heath on Sabbatical until around August 1, 2011, presumably the incident described by Mosby occurred in the fall of 2011.  There was a similar incident on April 27, 2010. Heath's Exhibit 14 (PL 00296-97).  Mosby's signature does not appear on the report of the April 2010 incident.

[10]  Defendants contend that this is the start date for the temporal scope of Heath's Title VII claims.

When Morris learned about Anderson's petition, she helped gather signatures.  Heath's Exhibit 6 (Morris' declaration).

On November 18, 2012, Heath wrote to five Southern officials concerning a letter Elaasar wrote to her about tutoring students at 7:00 a.m.  Elaasar complained that she was not keeping her 40 hour a week commitment to Southern.  Other issues raised in the letter include:  (1) the incident with her dying mother; and (2) Math 151 students.  Heath's Exhibit 16 (PL 00522-25).

On April 8, 2013, Heath filed a charge of discrimination with the EEOC.[11]  She checked the boxes for retaliation and sex and no others.  She indicated that the discrimination began on June 5, 2012 and was continuing.  Defendants' Exhibit 4.  The EEOC issued a notice, dated April 8, 2013.  Defendants' Exhibit 5.  On May 13, 2013, the EEOC issued a right to sue letter. Defendants' Exhibit 6.

On July 13, 2013, Heath filed her original complaint in this action.  She named the Southern University System Foundation ("Foundation") and Elaasar as defendants.  Rec. doc. 1.  The Foundation answered and denied that it was the employer of either Elaasar or Heath.  Rec. doc. 5. On October 16, 2013, Heath filed a first amended complaint.  She named the Board of Supervisors of the University of Louisiana System and Elaasar as defendants.  Rec. doc. 12.  The Foundation again answered and denied it was the proper defendant.  Rec. doc. 18.  Heath's motion to substitute was granted.  Rec. doc. 32.  Elaasar answered the complaint and amended complaint.  Rec. doc. 36.

Elaasar and the Foundation moved for summary judgment.  Rec. docs. 40 and 41.  The Foundation's motion for summary judgment was granted.  Elaasar's motion was granted as to the

---

[11]  Defendants' Exhibit 4 is an undated and unsigned copy of the charge.  Defendants report that a copy of the dated and signed charge is not available from the EEOC.  Rec. doc. 67 (Memorandum at 10, n. 4).  The EEOC issued a notice of charge of discrimination, dated April 8, 2013.  Defendants' Exhibit 5.

Title VII claim against him in his individual capacity.  He also urged that while an agent of an employer may be sued under Title VII in his official capacity, the action cannot proceed against both the employer and agent named in his official capacity.  Elaasar's motion was granted as to the Title VII claim against him in his official capacity.  Heath was allowed to amend to assert Section 1983 claims against Elaasar in his individual capacity.  Rec. doc. 48.

On August 27, 2014, Heath's state court petition was deemed abandoned.  All claims against the defendants were dismissed.  Defendants' Exhibit 2.

On December 5, 2014, Heath filed the second amended complaint.  Rec. doc. 50.  The Board and Elaasar answered.  Rec. doc. 51.

The trial was set for February 1, 2016.  Rec. doc. 54. It was reset for June 6, 2016.  Rec. doc. 60.  On April 11, 2016, defendants filed their motion for summary judgment.  Rec. doc. 67.  At the request of Heath, she was granted additional time to oppose the motion.  Rec. doc. 69.  Heath filed an opposition.  Rec. doc. 70.  Defendants submitted a reply.  Rec. doc. 71.

**I. <u>Title VII</u>.**

<u>Temporal Scope of the Action</u>

Any Title VII discrimination claim that is not filed within 300 days of an occurrence is dismissed as untimely absent a demonstration of a continuing violation.  <u>Kimble v. Georgia Pacific Corporation</u>, 245 F.Supp.2d 862, 870 (M.D.La. 2002).  Heath filed her EEOC charge on April 8, 2013.  Defendants contend that the temporal scope of the action is limited to June 5, 2012 (300 days before the filing of the charge) through April 8, 2013.

Heath responds that:  (1) the lawsuit deals with what happened when she returned from her medical sabbatical leave and began the fall semester of 2011 (Rec. doc. 70 at 2 and 13); (2) because of Elaasar's continuing wrongful activity a student petition was circulated in the fall of 2012 to

protest Elaasar's treatment of Heath; and (3) Heath sought legal counsel and filed the complaint

with the EEOC. [12]  She contends that the continuing violation doctrine permits the extension of the

temporal scope from when she returned from sabbatical on or about July 1, 2011 through April 8,

2013.

> The continuing violation theory relieves a plaintiff of establishing that all of the
> complained-of conduct occurred within the actionable period if the plaintiff can
> show a series of related acts, one or more of which falls within the limitations
> period.  The continuing violation doctrine is designed to accommodate plaintiffs
> who can show that there has been a pattern or policy of discrimination continuing
> from outside the limitations period into the statutory limitations period, so that all
> discriminatory acts committed as part of this pattern or policy can be considered
> timely.
>
> Although there is no definitive standard for what constitutes a continuing violation,
> the plaintiff seeking to invoke this doctrine must demonstrate more than a series of
> discrete discriminatory acts: He must show an organized scheme leading to and
> including a present violation, such that it is the cumulative effect of the
> discriminatory practice, rather than any discrete occurrence, that gives rise to the
> cause of action.  This court has identified at least three factors that may be
> considered in determining if a continuing violation exists: (1) Do the alleged acts
> involve the same type of discrimination, tending to connect them in a continuing
> violation? (2) Are the alleged acts recurring or more in the nature of an isolated
> work assignment or incident? (3) Does the act have the degree of permanence which
> should trigger an employee's awareness of and duty to assert his or her rights?

Celestine v. Petroleos de Venezuela SA, 266 F.3d 343, 351-52 (5th Cir. 2001) (citations and

quotation marks omitted).

---

[12] Heath concedes several times in her deposition that she has a difficulty remembering dates.  For example,

Q.  When did that meeting take place?
A.  When did that happen?  I could get a date because I wrote a letter.
Q.  Okay, Was it before or after 2009?
A.  Tell me the point of reference for 2009.  Is this when I came to Dr. –
Q.  This is when you filed your first lawsuit against –
A.  It was after.
Q.  After you filed your first lawsuit?
A.  You know, I don't remember.  But that may have been the reason – I don't remember dates.  I'm so
sorry.

Heath Dep. 60-61.  See also Heath Dep. at page 24 (lines 14-15), pages 49-50 and page 103 (lines 3-9).

[A] one-time employment event, including the failure to hire, promote, or train and dismissals or demotions, is the sort of discrete and salient event that should put the employee on notice that a cause of action has accrued. These discrete adverse actions, although racially motivated, cannot be lumped together with the day-to-day pattern of racial harassment and therefore, if otherwise untimely, cannot be saved by the continuing violation doctrine. An employee who claims to be the victim of a racially motivated failure to promote or train is put on notice that his rights have been violated at the time the adverse employment decision occurs, and must therefore bring the claim within 180 days of the adverse decision.

The appellants' hostile work environment claims are potentially more compatible with the continuing violation doctrine. However, the continuing violation doctrine does not automatically attach in hostile work environment cases, and the burden remains on the employee to demonstrate an organized scheme led to and included the present violation. In addition, the continuing violation theory requires the same type of discriminatory acts to occur both inside and outside the limitations period, such that a valid connection exists between them. Finally, where a pattern of harassment spreads out over years, and it is evident long before the plaintiff sues that she was a victim of actionable harassment, she cannot reach back and base her suit on conduct that occurred outside the statute of limitations.

Id. at 352 (citations and quotation marks omitted and emphasis added).[13]

"The focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect his rights." Messer v. Meno, 130 F.3d 130, 135 (5th Cir. 1997) (quoting Berry v. Board of Supervisors of LSU, 715 F.2d 971, 979 (5th Cir. 1983)). "Importantly, however, the particular context of individual employment situations requires a fact-specific inquiry that cannot easily be reduced to a formula." Huckabay v. Moore, 142 F.3d 233, 239 (5th Cir. 1998) (citing Berry, 715 F.2d at 981).

Heath's allegations of a hostile environment begin in 2003 after Elaasar became chairman of the department of mathematics and physics. In November 2003, she encountered difficulty in

---

[13] The first step in the analysis is to examine Heath's claims to determine whether any are in the nature of one-time employment events that should have put her on notice that a cause of action had accrued. The only such event was the failure to promote her to the position of full professor. This occurred prior to the filing of the August 2009 petition. Heath testified that she had not re-applied for full professor because she did not have any hope of getting the position. Heath Dep. 13-14. There are no one-time employments events that put her on notice of her cause of action after her return from the sabbatical on or about July 1, 2011.

securing leave to see her sister in Virginia, who had been diagnosed with cancer.  When she returned she found that the final exam for her class had been rewritten.

In August 2009, she filed the petition in state court.  Some of the allegations in the petition are the same as allegations made in support of this federal court suit.  For example, in August 2009, she alleged that the defendants denied her the opportunity to teach online courses.  Defendants' Exhibit 1 at 4.  The second bullet point in Heath's May 2, 2016 declaration states Elaasar "did not allow me to teach online."  Heath's Exhibit 1 at para. 22.

In May 2010, Heath was continuing to pursue her state court suit.  Heath testified that when she received the letter from the mathematics faculty, dated April 21, 2010, she went to her attorney who advised her to respond to it.  He secured additional time for her to respond.  Heath Dep. 114-15.  Her response is the letter of May 4, 2010 to David Adegboye.  Among those copied is Heath's lawyer in the state court action.  Defendants' Exhibit 7.  Some allegations raised in the May 4, 2010 letter are similar to the allegations made in support of her federal court suit.  For example, in May 2010, Heath alleges that "Dr. Elaasar went to my class and undermined my job performance to my students."  Defendants' Exhibit 7 at 5 (PL 00303).  The eighth bullet point in Heath's May 2, 2016 declaration states "[h]e still undermined me to my students and other faculty."  Heath's Exhibit 1 at para. 22.

In July 2010, Heath's physician reported that she had significant job-related stresses and her diabetes and hypertension were uncontrolled.  He stated she would benefit from a sabbatical leave.  Heath's Exhibit 12 (DEF 00007).

On or about July 1, 2011, Heath returned from her sabbatical to teach in the fall semester.  The hostile environment resumed with her return.  One of Heath's students, Derrlyn Mosby reports

that in 2011 she took Heath's statistics class.  On a day that Heath was out ill, Elaasar entered the classroom.  Mosby states:

> It quickly became apparent that Dr. Elaasar was attempting to use Dr. Heath's absence to turn her students against her.  By his questions, he would suggest that Dr. Heath was not an effective teacher and he encouraged those who might have negative comments to voice them.

Heath's Exhibit 7 at 1.  Before and after her sabbatical, it appears Elaasar was undermining her job performance to her students.  Heath states in her May 2, 2016 declaration that, "[a]fter I returned back to SUNO to teach in the Fall of 2011, Dr. Elaasar continued his harassing and discriminatory behavior. . . ."  Heath's Exhibit 1 at para. 21.

About a year later on September 19, 2012, Heath writes to Dr. Adegboye, the vice chancellor of academic affairs, and lists the incidents that she considers to be discriminatory and harassing behavior by Elaasar directed at her.[14]  She expresses the hope that Dr. Adegboye will not allow Dr. Elaasar to continue to treat her unfairly.  Heath's Exhibit 16 (PL 00316-18).  Heath's declaration does not state what, if any, response she received from Dr. Adegboye.

After the students circulated a petition, Heath wrote a letter, dated November 18, 2012, to Dr. Ukpolo, the chancellor, Dr. Adegboye, and three others.  Heath's Exhibit 16 (PL 00522-25).  The letter was written in response to a letter Dr. Elaasar sent to her concerning the time when she tutored students as well as other issues.  In the letter, Heath states:

> It is very clear from the pattern of harassment that I have been subjected to in the past that the only motive Dr. Elaasar had in writing this letter is to continue the harassment.  I do not expect that Dr. Elaasar will change or stop his unfair, discriminatory treatment towards me.  However, I hope that I can count on you to put an end to it immediately.  Dr. Elaasar's behavior has reached a point that is so irrational that I am not only intimidated by his behavior but I am also afraid.  Hence I am appealing to you for help.

---

[14] The letter lists 17 bullet points.  15 of these bullet points are found in paragraph no. 22 of her declaration. Compare Heath's Exhibit 16 (PL 00316-81) to Heath's Exhibit 1 at para. no. 22.

16

Id. at PL 00524.  Heath's declaration does not state what response, if any, she received to this letter.  She filed her EEOC charge on April 8, 2013.  In the statement of particulars in the charge, Heath reports that she followed the chain of command and reported Elaasar's actions but "not a single person has questioned me or made any effort to protect me from future harm."  Defendants' Exhibit 4.

The record demonstrates that the conduct that Heath alleges supports her hostile environment claim began after Elaasar became department chairman.  The conduct continued after she filed her 2009 suit until she took her sabbatical.  It resumed upon her return in 2011.  She never obtained any relief from the Southern administration.  The resumption of the alleged behavior after her return from her sabbatical should have alerted Heath to act to protect her rights, particularly in light of the fact that some of the same behavior prompted her to file the state court petition in 2009.  The continuing violation doctrine is not available to extend the temporal scope of Heath's action.  Her claim is limited to the 300 days preceding the filing of the EEOC charge (June 5, 2012 to April 8, 2013).

Failure to Exhaust

Defendants contend that Heath did not exhaust her administrative remedies under Title VII for any claims other than her claims based on gender and retaliation.  They urge that claims based on race, religion or national origin must be dismissed.

Gender and retaliation were the only boxes checked on the EEOC charge form.  Heath did not check the boxes for race, religion or national origin.  Her description of the particulars of the charge only refers to gender and retaliation.  Defendants' Exhibit 4.

In Castro v. Texas Dep't of Criminal Justice, 541 F. App'x 374 (5th Cir. 2013), the Fifth Circuit stated:

A plaintiff alleging workplace discrimination must exhaust his administrative remedies before he may sue under the ADEA, Title VII, or the TCHRA. We will not condone lawsuits that exceed the scope of EEOC exhaustion, because doing so would thwart the administrative process and peremptorily substitute litigation for conciliation. . . .

Castro's EEOC claims in this case did not in any way signal that he might have been a victim of race or sex discrimination. Although the form contained boxes to check for discrimination based on race, color, sex, religion, national origin, retaliation, age, disability, genetic information, and other, Castro checked only the retaliation and age boxes. In the form's section asking for the particulars of his claim, he explained only the basis for his age discrimination charge, making reference to neither his race or sex, nor to incidents of discrimination based on those characteristics. He concluded: I believe that I have been discriminated against because of my age, and retaliated against, in violation of the ADEA.

Id. at 379. The Fifth Circuit held that because Castro never presented claims based on race or sex to the EEOC, he could not have exhausted them. Id.

Heath makes no response to the argument that she did not exhaust her administrative remedies under Title VII. Her only response to this issue concerns her Section 1983 claims. Rec. doc. 70 at 20-21. Her Section 1983 claims are addressed below. Heath's Title VII claims based on race, religion or national origin must be dismissed.

<u>Retaliation</u>

Heath's Title VII retaliation claim is based on her contention that defendants' retaliated against her after she filed the suit in August 2009. Defendants' Exhibit 3 at 49-50 and Exhibit 4 (EEOC charge "I believe that I have been retaliated against because I filed a law suit against Southern University At New Orleans, based on gender, female. . . ."). Under Title VII, a "plaintiff establishes a *prima facie* case of retaliation by showing: (1) he engaged in a protected activity; (2) an adverse employment action occurred; and (3) there was a causal link between the protected activity and the adverse employment action." Hernandez v. Yellow Transportation, Inc., 670 F.3d 644, 657 (5th Cir. 2012) (citing Taylor v. United Parcel Service, Inc., 554 F.3d 510, 523 (5th Cir. 2008)).

Defendants concede that Heath engaged in protected activity when she filed the suit in 2009. In Burlington Northern & Santa Fe Railway Co., 548 U.S. 53, 126 S.Ct. 2405 (2006), the Supreme Court rejected the standards applied in the Courts of Appeals, including the Fifth Circuit, that limited actionable retaliation to ultimate employment decisions. Id. at 2414. It adopted the following language to describe the level of seriousness to which the harm (retaliation that produces an injury or harm) must rise before it becomes actionable retaliation.

> In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Id. at 2415 (citations and quotation marks omitted). The Supreme Court spoke of material adversity to separate significant from trivial harms. Id. It phrased the standard in general terms "because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." Id. It provided an example.

> A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an act that would be immaterial in some situations is material in others.

Id. at 2415-16 (citations and quotation marks omitted).

Heath alleges that Elaasar excluded her from committees and refused to permit her to participate in projects. The effect of these and other actions was to deny her the opportunity to apply for a promotion. Defendants' Exhibit 3 at 13-14. In context, the harms alleged by Heath as a result of the filing of the 2009 action are significant and not trivial harms.

The third element of the retaliation claim is that there must be a causal link between the protected activity (filing the suit in August 2009) and the adverse employment action taken after June

5, 2012 (300 days prior to filing her EEOC charge).  While it is assumed that Heath can establish that Elaasar knew of her August 2009 suit, Elaasar never discussed the suit with her.  Heath Dep. 69-70.

In <u>Swanson v. General Services Administration</u>, 110 F.3d 1180, 1188 (5th Cir. 1997), the Fifth Circuit held that close timing between an employee's protected activity and an adverse employment action against him may provide the causal connection to make out a *prima facie* case of retaliation. <u>See also</u> <u>McCoy v. City of Shreveport</u>, 492 F.3d 551, 561, n. 28 (5th Cir. 2007).  Heath cannot show close temporal proximity between her filing the suit in August 2009 and Elaasar's alleged actionable conduct after June 5, 2012.

In <u>University of Texas Southwestern Medical Center</u>, 133 S.Ct. 2517 (2013), the Supreme Court held that "a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."  <u>Id</u>. at 2534.  It recognized that this standard was more demanding than the motivating-factor standard.  <u>Id</u>.  In <u>Zamora v. City of Houston</u>, 798 F.3d 326 (5th Cir. 2015), <u>cert. denied</u> 2016 WL 98779, the Fifth Circuit compared the standards for a Title VII discrimination claim and a retaliation claim.  It stated:

> A plaintiff asserting a Title VII *discrimination* claim must show only that the employer's discriminatory motive was a motivating factor for an adverse employment action.  In *Nassar,* the Supreme Court clarified that a plaintiff asserting a Title VII *retaliation* claim must meet a higher standard of causation.  Such a plaintiff must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.

<u>Id</u>. at 331 (emphasis in original and citations and quotation marks omitted).

Heath has not demonstrated that the suit filed by her in August 2009 was a but-for cause of the alleged adverse actions by Elaasar from June 5, 2012 to April 8, 2013.  Heath has not established a *prima facie* claim of retaliation under Title VII.

<u>Hostile Work Environment</u>

Heath alleges that the harassment arises out of the conduct of her supervisor, Elaasar.  In such circumstances there is a four factor test to determine if Heath has established a viable cause

of action:   (1) the employee belongs to a protected group;  (2) the employee was subject to unwelcome sexual harassment;  (3) the harassment complained of was based upon sex;  and (4) the harassment complained of affected a "term, condition or privilege of employment," i.e., the sexual harassment must be sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment.  <u>E.E.O.C. v. Boh Bros. Const. Co</u>., 731 F.3d 444, 452 (5th Cir. 2013).

Defendants concede that Heath meets the first requirement for a *prima facie* claim of harassment because she belongs to a protected group (female).  For purposes of the motion, it also accepts that she satisfies the second requirement.  It urges that she cannot satisfy the third and fourth requirements.  Rec. doc. 67 (Memorandum at 17).

In her testimony, Heath does not limit the claim to gender.  For example, in response to a question aimed at determining her understanding of the source of Elaasar's bias, Heath stated:

> There has to be a reason, I think it has to do with the fact that I'm Greek and he's Egyptian overall; right?  The details I just mentioned.  Yeah, but that's what they have been.  And also, it has to do with the retaliation to the lawsuit.  So put them all together, discrimination for gender, discrimination for the religion, they're all factors.  And I put them – they're all had something to do – they all factors that contributed to his behavior.

Heath Dep. 77-78.  At another point, she stated, "[t]he friction is his attitude and his beliefs towards me who I am towards my cultural background and my cultural behavior."  <u>Id</u>. at 76.  Because of her failure to exhaust administrative remedies for race, religion and national origin, Heath is limited to demonstrating that the harassment by Elaasar was based on her gender.

Heath reports one sexist remark that she attributes to Elaasar.  Dr. Omojola told Heath that Elaasar did not let her participate in meetings because she talked too much for a women.  The remark was not made directly to Heath by Elaasar.  Heath Dep. 28-30.  Heath testified that there were no other statements made by Elaasar referring to her as being a woman.  Id. at 53-54.

The defendants argue that Cynthia Singleton ("Singleton") demonstrates that there was no gender discrimination.  Singleton is an African-American woman.  Heath Dep. 34:6-7.  She is not a Muslim.  Heath Dep. 34:19-21.

She graduated from John F. Kennedy High School in 1980.  She obtained an accounting degree from Southern in 1985.  She studied math education at UNO from 1992 to 1994.  She obtained a master's degree in teaching mathematics at Loyola in 1996.  She obtained a Ph.D. in science and mathematics education at Southern in Baton Rouge in 2009.  She was a high school mathematics teacher in the Jefferson Parish Public Schools from August 1988 through May 1996.  She began at Southern in 1996.  Her current position is associate professor of mathematics at Southern.[15]

Singleton and Heath began teaching at Southern in the same year, 1996.

On October 15, 2001, Singleton signed a letter addressed to the Promotion and Tenure Committee on behalf of Heath, who was applying for promotion and tenure.  Singleton's title at that time was instructor of mathematics.  Heath's Exhibit 2 (PL 00425).

Elaasar became chairman of the department of mathematics in 2003.  Heath's Exhibit 1 at para. 1.

Heath described herself and Singleton as good friends.  Heath helped Singleton write her dissertation over a two year period.  Heath Dep. 38:10-18.

There is no reference to Singleton in Heath's letters of complaint prior to the filing of the August 2009 lawsuit.  See Heath's June 20, 2005 letter "to whom it may concern" with complaints of harassment (Heath's Exhibit 10 [PL 00462-71]); April 9, 2008 request for sabbatical to write a book (Heath's Exhibit 10 [PL 00487-89]); Undated (most likely spring 2009) letter with

---

[15] The information in this paragraph was obtained from the entry for Singleton at LinkedIn.

complaints about math tutoring lab and other subjects (Heath's Exhibit 10 [PL 00460-61] and Exhibit 16 [PL 00460-61]); and June 2, 2009 memo to Elaasar concerning his failure to involve Heath throughout the spring semester of 2009 (Heath's Exhibit 10 [PL 00485-86]).

After the filing of the suit, the relationship between Heath and Singleton began to change. On November 18, 2009, Heath wrote to Elaasar regarding testing information provided for the SACS accreditation assessment.  Heath contended that the faculty agreed with her but that Singleton insisted on a different approach because that was what Elaasar wanted.  Heath's Exhibit 11 (PL 00508-10).

The only communication in the record by Singleton is found in an email exchange with Heath occurring from February 4, 2010 through February 11, 2010.  Heath's Exhibit 13 (PL 00379-82).  It begins with an announcement of a mandatory faculty meeting for February 8, 2010. Singleton emails Dr. Omojola to complain that because of the mandatory meeting, she is forced to cancel a meeting about the mathematics curriculum.

On February 8, 2010, Heath emails Singleton and complains that the mandatory meeting will be a waste of time.  The next day Singleton replies that the mandatory meeting was not called by her and Heath will have to talk to Elaasar.  Heath replies that Singleton missed her point. Singleton replies that she did not miss the point and that the time was wasted for her.  Singleton ends, "[w]e have to sit and be quiet."  Id. at PL 00381.

Heath replies within minutes that she agrees with Singleton.  Heath raises the gender issue and states that she refuses to sit and be quiet.  She is a strong smart capable woman.  She reports that she was told that she talked too much.  Heath invites Singleton to come over to have coffee so they can talk with a third person, Angela, who is with Heath.

Singleton responds the next day, February 10, 2010:

> I do not think that this a gender issue.  It is a math unit issue.  No one in the math unit responded to the biology new hire presentation.  We (math unit) sat and were very quiet and wasted time that is my opinion.  This is not a gender issue.

Id. at PL 00380. Heath replies on the afternoon of February 10, 2010 that her remark regarding her gender was based on her personal experience.  Heath adds, "I would have been glad to know that you did not have similar experience but I know from talking to you before that you did."  Id.

Singleton responds with a four paragraph email, dated February 11, 2010.  The second paragraph refers to culture and gender differences.  In the last paragraph, Singleton suggests that notwithstanding their friendship, Heath had made "a strong decision toward the University . . . ."  Id. at PL 00380 (It appears that this a reference to the lawsuit filed in August 2009).  Singleton comments that "[i]t is difficult for most of us because we are caught in the middle of a battle."  Id.[16]

When the problems with Elaasar began, Heath asked Singleton not to turn against her.  Heath Dep. 38:18 to 39:1.  Later Singleton indicated to Heath that she had to turn against her so she could get her tenure.  Heath Dep. 39:2-11.

On February 25, 2010, Heath wrote to Dr. Mims, an associate dean, concerning Math 151 and Math 161.  Heath's Exhibit 11 (PL 00490-92).  Singleton and Elaasar disagreed with Heath over the content of Math 151.  Singleton prepared a test for Math 151.

On March 24, 2010, Dr. Omojola wrote a letter to Heath.  Heath's Exhibit 11 (PL 00397).  He took issue with a statement that Heath made in a March 22, 2010 meeting regarding what was being taught in the math courses by Singleton and him.  On April 4, 2010, Heath responded and

[16]  At the time of the March 2016 deposition of Heath, the February 4-11, 2010 email string had not been produced to counsel for Southern.

24

told Dr. Omojola to look at a final exam Singleton prepared.  Singleton was copied.  Heath's Exhibit 11 (PL 00398-400).

On April 19, 2010, Heath wrote to Dr. Bishop, the assistant vice-chancellor, and Dr. Mims, the assistant dean.  Heath's Exhibit 11 (PL 00401-04).  Heath reported that at an April 16, 2010 meeting, Singleton did not want to acknowledge Heath's presence.  Singleton's "bad attitude" continued.  Heath accused Singleton of switching the times of the meetings to exclude her.

On April 21, 2010, the math faculty wrote a letter to David Adegboye, vice chancellor for academic affairs, concerning Heath.  The letter is not in the record before the Court on the motion for summary judgment.

On May 4, 2010, Heath addressed to Dr. Adegboye a response to the math faculty letter of April 21, 2010.  Defendants' Exhibit 7 and Heath's Exhibit 11 (PL 00299-308) ("May 4 Letter").  Heath contends that the persons who signed the April 21 letter were intimidated into signing it because they did not want to hurt their chances to obtain tenure.  Heath Dep. 112:-10 to 113:16.  Heath refers to a conversation with Singleton that she had the day of the deposition (March 18, 2016) about how things are done at Southern.  "They campaign against each other.  Then she said yeah, that's what they did with us.  And so --."  Heath Dep. 114:14-18.

The May 4 Letter contains other references to Singleton.

1.  Earlier in the semester (Jan to May 2010), Heath asked Singleton why was she rude to her during a meeting.  Singleton reported that she felt threatened by Elaasar because he was the one that was going to sign her tenure application.  Page 1, para. 2.

2.  The April 15, 2010 meeting was set by Singleton when she knew or should have known that Heath was in the middle of a class.  Page 3.

3.  Singleton would not acknowledge Heath when she raised her hand during a meeting. Page 4.

4.  Heath recommended that Singleton employ a procedure. She refused to listen to Heath. She said she was doing what Elaasar wanted. Page 4.

5.  It was upsetting that Singleton unilaterally changed the curriculum of Math 151, 161 and 118. Page 4. When Heath realized that Singleton made changes in the syllabi for the three courses, she complained. Page 8. The curriculum was changed by Singleton without the rest of the department's knowledge. Heath did not cover two objectives that Singleton included in the Math 151 curriculum because they belonged in Math 161. Page 9.

6.  Singleton was not willing to make any adjustments to the common exams. Page 5. Singleton prepared a first draft of the common exam for Math 151. Page 6.

7.  Singleton was only interested in the disrespect directed to Heath. She was only interested in getting to Heath. Page 7.

There are no further letters, memos, emails or other communications that refer to Singleton. There are additional references to Singleton in Heath's deposition.

Elaasar did not let Heath approve her schedule; neither the class schedule nor the courses she taught. She liked to teach calculus. She was qualified to teach calculus because of her master's degree in math. Elaasar restricted her to college algebra. He allowed people without master's degrees in math to teach calculus, including Dr. Omojola, who had an engineering degree and Singleton, who had a degree in accounting and a Ph.D. in math education. Heath Dep. 32:9 to 33:13. When asked why she thought he allowed Dr. Omojola and Singleton to teach these classes and not herself, she answered that he was discriminating against her. Heath believed that the basis

26

for the discrimination was: (1) retaliation; (2) she talked too much for a woman; (3) she was not Muslim; and (4) she was a woman; a very liberated woman.  Heath Dep. 33:14-25.

Singleton prepared a program for the SACS accreditation with a common syllabus and common tests.  Heath believed Singleton was not supposed to make these decisions herself.  Heath should have been involved.  Heath described preferential treatment for Singleton on the preparation of a final exam.  Heath Dep. 36:1 to 37:19.  Heath indicated that Singleton was involved in not letting Heath have the final exams in time for Heath to review them with her students.  She believed Singleton was doing this because she did not have tenure at the time and wanted to please Elaasar.  Heath Dep. 36:1 to 38:6.

Singleton prepared the SACS report.  Heath Dep. 41:17. All of the faculty was asked to review the report.  Heath made three corrections.  Singleton had referred to Dr. Omojola and others as being African-Americans.  Heath corrected this to show that they were Africans but not Americans.  Singleton's draft of the report also referred to using final exams to evaluate students. Heath Dep. 41:23 to 42:6.  Heath objected that she did not see the final exam until the day before it was to be administered.  Dr. Omojola and Dr. Kam wrote a nasty letter.  Heath responded that she was not trying to offend Singleton.  Heath was trying to correct the report for the SACS accreditation.  Heath Dep. 42:6-21.

Heath was asked to identify the committees from which she was excluded.  She responded with what she described as a very important example – the committee that selects for tenure and promotion.  Even though Heath was the only tenured person in the department, Elaasar did not put her on the committee.  He put Singleton on the committee.  At the time Singleton did not have a Ph.D. and did not have tenure.  Heath did not know when Singleton was appointed to the committee.  Heath Dep. 58:6-20.

Heath contends that Elaasar turned the faculty, including Singleton, against her.  Heath Dep. 119:23 to 120:16.  Heath accused Elaasar of empowering Singleton to harass her and everyone else.  Heath Dep. 122:1.

Heath described Elaasar as thinking that women are not reasonable.  Heath Dep. 130:16. She was asked if she knew why Elaasar favored Singleton.  Heath Dep. 130:23-24.  Heath responded that Singleton was his favorite because she served the purpose of his effort to discredit Heath.  Dep. 130:25 to 132:12.  "Singleton is African-American and the rest of the department are foreigners so she has an attitude like she is there and we are just 'leftovers'."  Heath Dep. 131:5. Heath believes that Singleton is not a bad person, but she takes care of her herself.  Heath Dep. 131:12-23.  Elaasar and Dr. Omojola worked together and Singleton "was the chosen one that did everything because I could not do anything so I'm going to have to do everything. . . ."  Heath Dep. 132:6-12.

There was an email or emails that contained a comment that Heath was "white trash".  See Heath Dep. 142-145 and 144:15.  Heath reports that Singleton stopped writing those letters.  Heath Dep. 145:22.  There is another reference in the record to someone calling Heath "white trash." The June 20, 2005 memo by Heath to whom it may concern at page 10 refers to a controversy with a Mrs. Davis concerning calculators distributed to students without securing deposits from them. Heath reports that Davis became very upset and called her "white trash".   At the time Heath did not know the meaning of the expression.  Heath's Exhibit 10 at PL 00469.

Heath testified that there was a very strong connection between Dr. Omojola and Singleton. Heath Dep. 35:3-8.  Singleton received a lot of favoritism because of the connection with Dr. Omojola.  Heath Dep. 35:5.  Singleton, a woman, was not subjected to discrimination because she was protected by Dr. Omojola.   Heath did not know the nature of the relationship between

Singleton and Dr. Omojola.  She suspected that it had to do with the fact that Singleton's husband, who was killed, was from the same country as Dr. Omojola.  Heath Dep. 35:10 to 36:3.  At the time of Heath's deposition (March 18, 2016), Heath reported that something had happened between Dr. Omojola and Singleton, but Heath did not know what had happened.  Heath Dep. 44:13-20.  At time of the deposition (March 18, 2016), Elaasar was no longer in a position of authority over Dr. Omojola or Singleton.  Heath Dep. 44:13-16.

Assuming that Elaasar's conduct toward her was because she was a woman, Heath does not explain why Elaasar gave her the highest possible score on a May 1998 peer evaluation or why in the fall of 2001, he gave her a very positive recommendation when she applied for promotion to associate professor.  Rec.doc. 70-3 at 8 and 10-11.

The facts relating to Singleton's treatment by Elaasar do not support Heath's contention that Elaasar's harassment was based on her gender.  To cite one example, Elaasar excluded Heath from the tenure committee, but put Singleton, a female, on it.  The statements by Heath's students do not alter this conclusion.  For example, the student who drafted and circulated the petition stated that in his meeting with Elaasar, he learned that:

> Dr. Elaasar regarded Dr. Heath as a person whom he couldn't control.  He considered her to be untrustworthy.  He obviously was angry with her.  I concluded from this attitude and state of mind that he was unhappy that she was not more submissive to his authority, and that he felt that she was disrespectful of him, and failed to acknowledge his role as her superior.

Rec. doc. 70-6 at 1.  None of the students reports sexist remarks made by Elaasar about Heath. Rec. doc. 70-6, 7 and 8.  Based on the facts as presented, she cannot establish the third element for a *prima facie* claim of a hostile work environment.  It is not necessary to consider whether she can establish the fourth element.

Heath is unable to establish a hostile work environment claim for harassment based on her gender arising out of the conduct of her supervisor, Elaasar.

Southern's motion for summary judgment as to Heath's Title VII claims will be granted and those claims will be dismissed.

**II.  <u>Section 1983</u>**.

In response to Heath's Section 1983 claims, Elaasar contends that:  (1) Louisiana's one year prescriptive statute applies to Heath's Section 1983 claim; (2) the continuing violation doctrine does not extend the statute of limitations for her Section 1983 claim; (3) she cannot demonstrate that he subjected her to unwelcome harassment based on a protected characteristic; and (4) she has no evidence of specific acts by him that violated her rights to equal protection within one year of filing her lawsuit on July 3, 2013.

Heath does not dispute that Louisiana's one year prescriptive statute applies to her Section 1983 claim.  She does contend that the continuing violation doctrine extends the actionable period.

For a Section 1983 action, the court looks to the forum state's personal injury limitations period.  In Louisiana, that period is one year.  <u>Jacobsen v. Osborne</u>, 133 F.3d 315, 319 (5th Cir. 1998).  Section 1983 and Title VII are parallel causes of action.  <u>Fields v. Stephen F. Austin State University</u>, 611 F. App'x 830, 833 (5th Cir. 2015).  Because Heath is unable to establish a continuing violation under Title VII, she is unable to demonstrate one under Section 1983.  The actionable period for Heath's Section 1983 claim against Elaasar is the twelve months prior to her filing suit in federal court on July 3, 2013.

> In order to succeed on a hostile work environment claim, plaintiffs must prove, among other things, that they were subjected to unwelcome harassment based on race or sex that affected a condition of employment.  To affect a condition of employment, the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

<u>Fields</u>, 611 F. App'x at 833 (quotation marks omitted and citing <u>Ramsey v. Henderson</u>, 286 F.3d 264, 268 (5th Cir.2002); and <u>Lauderdale v. Tex. Dep't of Criminal Justice, Institutional Div.</u>, 512 F.3d 157, 163 (5th Cir. 2007)).

Defendants contend that Heath has no evidence of specific acts by Elaasar that violated her rights to equal protection within one year of filing her suit in federal court.  They urge that there is no evidence that any single act committed by Elaasar was specifically motivated by Heath's gender, race, religion or national origin.  They argue that Heath relies on her subjective belief about what motivated Elaasar's alleged harassment.[17]

Heath argues that Southern knew about Heath's gender based complaints and took no action.  She contends that this resulted in the student led petition against Elaasar and in her favor.  She relies on her female gender, her Greek ethnicity and her Greek Orthodox religion.  She contends that after her return from the sabbatical, Elaasar continued his offensive conduct which compromised her ability to work and refers to the fifteen bullet points in her May 2, 2016 Declaration.  Heath's Exhibit 1 at para. 22.

Heath does not address what particular conduct occurred in the twelve months prior to her filing the lawsuit on July 3, 2013.  Her difficulty with dates has already been noted.  With the exception of the sixth bullet point which refers to the fall semester in 2012 none of the other bullet points indicate when the acts occurred.  Heath's Exhibit 1 at para. 22.  Heath's letter of September 19, 2012 to Dr. Adegboye provides little guidance as to when the acts occurred except for the date of the letter.  Heath's Exhibit 16 (PL 00316-18).  Like the May 2, 2016 declaration, the third bullet point on the second page indicates that it occurred at the beginning of the fall 2012 semester.  The second bullet point on that page indicates that it occurred in 2012.  In the second bullet point on the third page, Heath requests the minutes of faculty meetings for the last four years.

---

[17]  "Though Cavalier may believe that all twelve incidents were motivated by racial animus, subjective belief of racial motivation, without more, is not sufficient to show a hostile work environment."  Cavalier v. Clearlake Rehab. Hosp., Inc., 306 F. App'x 104, 107 (5th Cir. 2009) (emphasis added).

Heath's letter of November 18, 2012 to Dr. Ukpolo and others does not provide dates for the complaints. Heath's Exhibit 16 (PL 00522-25). Some clearly relate to the period prior to her sabbatical; for example the issues about her mother and sister. Others indicate they are more current. In the second full paragraph on page two she refers to "during the summer I applied for an adjunct faculty position. . . ." Id. at PL 000524. On that same page she indicates that her students in Math 151 were not doing well because Elaasar would not allow her to see her final exam until two days before the students were to take it.

Heath contends that Elaasar's conduct was motivated by her gender, female. The Court's review of the evidence relating to Singleton, an African-American female, demonstrates that Heath is unable to establish a claim for harassment based on her gender arising out of the conduct of her supervisor, Elaasar. Drawing all inferences in Heath's favor, Elaasar's conduct within the actionable period is not sufficiently severe or pervasive to alter the conditions of Heath's employment and create a hostile work environment based on her gender. [18]

The motion for summary judgment as to Heath's Section 1983 claims will be granted and those claims against Elaasar will be dismissed.

IT IS ORDERED that defendants' motion for summary judgment (Rec. doc. 67) is GRANTED.

New Orleans, Louisiana, this 24th day of May, 2016.

SALLY SHUSHAN
U.S. Magistrate Judge

---

[18] What motivated Elaasar's behavior toward Heath is unknown. Certainly, before he became chairman of the department he was her supporter and valued her work, teaching ability and personality. After he became head of the department his attitude toward her changed dramatically. There is no doubt that the environment was very unpleasant for Heath. But, given the constraints of the law as applied to this case, the conflict did not amount to an actionable prejudice.